UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | Cr. No.  08-034 (RCL) |
| v.  : | |
| : | |
| RICKY D. LINDSEY, : | Motions: September 11, 2008 |
| Defendant. : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO**
**SUPPRESS TANGIBLE EVIDENCE AND STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Ricky D. Lindsey's initial motion and supplemental motion to suppress tangible evidence and statements.  In support of its opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing regarding the defendant's motions:

Defendant's Current Charges

In this case, defendant is charged with the following five counts: 1) Unlawful Possession with Intent to Distribute 50 Grams or More of Cocaine Base, 2) Unlawful Possession with Intent to Distribute 500 Grams or More of Cocaine, 3) Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, 4) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, and 5) Unlawful Possession of a Machine gun.

Factual Background

I.    Basis For The Search Warrant

On November 27, 2007, law enforcement officers executed a search warrant from the District of Columbia Superior Court for the premises of xxxx  S.E.,, Washington D.C.  The search resulted

in the seizure of more than 100 grams of a substance containing PCP, more than one pound of marijuana, approximately five grams of crack cocaine, approximately twenty-four grams of heroin, a .380 caliber Bersa pistol, .45 caliber ammunition and body armor.[1] Based upon this evidence, Special Agent Daniel C. Sparks (SA Sparks) from the Federal Bureau of Investigation (FBI) arrested Timothy P. Johnson, a resident of the searched premises, for various drug trafficking and weapons violations.[2]

SA Sparks subsequently learned of two parallel investigations of Johnson by the Metropolitan Police Department (MPD). The first investigation related to the execution of a search warrant at xxxx, S.E., Washington, D.C. in August 2006. During the search of the premises, MPD seized a SKS Assault Rifle, .45 caliber ammunition and paperwork identifying Johnson. The same address was listed as the home address on Johnson's District of Columbia driver's license at the time of his arrest in November 27, 2007.

The second investigation stemmed from photographic evidence of child endangerment and illegal firearms possession. Johnson is the father of an infant son born on November 1, 2005. The child's mother, Danielle Evans, developed a roll of film in a camera that Johnson returned to her. Evans discovered a series of photographs appearing to show Johnson posing the infant with a Glock pistol and a Tec-9 type assault pistol.[3] The weapons depicted in the photographs had not been seized

---

[1] The Drug Enforcement Agency (DEA) laboratory reports for the PCP and marijuana were still pending at the time the search warrant in the present case was being sought. However, the affiant noted that the substances had the odor and packaging commonly associated with these drugs.

[2] On November 29, 2007, a grand jury subsequently indicted Johnson on three counts relating to the distribution of PCP and firearm violations.

[3] An MPD Firearms Examiner concluded from the photographs that at least one of the firearms depicted in the photographs was a real weapon.

by law enforcement. The photos show Johnson seated on a grayish couch with a blue wall in the background. MPD investigators canvassed the homes of relatives and friends of Johnson to identify the location depicted in the photo. On August 9, 2007, the MPD investigators met with Christine Lindsey, who identified herself as Johnson's aunt at X Street S.E., Washington, D.C. Moreover, Johnson was present inside the residence at the time. During the course of the interview, the investigators identified a grayish couch adjacent to a blue wall appearing to match those seen in Johnson's photographs. Agent Sparks searched available databases and determined that no warrant had yet issued for X Street, S.E., based on the facts known to him.

On February 7, 2008, Magistrate Judge Alan Kay of the United States District Court for the District of Columbia issued a search warrant for the premises at S.E., Washington, D.C. SA Sparks submitted an affidavit in support of the warrant relying upon the combined evidence of the FBI and MPD investigations, along with his extensive law enforcement background and experience, to establish probable cause for issuance of the warrant. Based upon these findings, the magistrate authorized a search warrant for the residence to search for evidence of (1) child endangerment, (2) unlawful possession of firearms and (3) conspiracy to distribute heroin, cocaine and PCP.

II.     Execution Of The Search Warrant

On February 14, 2008, at approximately 7:10 a.m., Agent Sparks and other members of the FBI, executed the search warrant. Agent Sparks knocked on the front door of the residence and announced the presence of law enforcement. The defendant, Ricky D. Lindsey, opened the front door and admitted the members. Four people were present in the residence, the defendant; a 47-year-old female; a 17-year-old female , and a two-year-old boy. The agents had the four people sit on a couch in the living room while they labeled the rooms and photographed the residence in its

pre-search condition. The defendant was handcuffed for officer safety during the search, but the females were not handcuffed so they could look after the two-year-old child. As officers began searching the residence, some crack cocaine was recovered from a bureau in a second-floor bedroom with bunk beds. Agent Sparks asked the defendant whether it was his room that contained bunk beds, and the defendant responded, "Yes." Police recovered from the defendant's bedroom the following items, among others: one black plastic bag containing chunks of suspected crack cocaine, one digital scale, a knife with white residue, one blue bag containing four clear bags of suspected cocaine, one Health plan card in the name of Ricky Lindsey, one Washington D.C. identification card in the name of Ricky Lindsey, one white plastic bag containing a digital scale with white powdery residue, one black bag containing an UZI semi-automatic submachine gun, 9mm, .40 caliber, .38 caliber and 5.56 rifle ammunition; and one blue bag containing three magazines.

## ARGUMENT

**I.    The Warrant Affidavit Provided a Substantial Basis to Support the Magistrate's Determination that Probable Cause Existed to Search the Residence**

A judicial officer's task in reviewing a search-warrant affidavit for probable cause "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). See also United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (citing Gates). This Court accords great deference to the judicial officer's determination of probable cause. See United States v. Johnson, 437 F.3d 69, 71 (D.C. Cir. 2006); United States v. Webb, 255 F.3d 890, 904 (D.C. Cir. 2001). A reviewing court examines only "whether there is substantial evidence in the record supporting the magistrate's

decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984); United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993).  Thus, "although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109 (1965).  Indeed, "[e]ven if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." United States v. Conley, 4 F.3d 1200, 1205 (3rd Cir. 1993).

> **A.** **There Was a Substantial Basis for a Finding of Probable Cause By a Neutral and Detached Judge**

The affidavit in support of the search warrant must be read in its entirety and in a common-sense and nontechnical manner.  Gates, 462 U.S. at 230-31.  Evaluated in that light, or indeed without any particular deference, the affidavit here contained ample facts to support Magistrate Judge Kay's finding of probable cause to believe that evidence of wrongdoing would be found at the target premises.  The information presented in Agent Spark's affidavit, showed both that 1) defendant Johnson was actively engaged in the crimes of narcotics trafficking while armed and child endangerment and 2) he was closely tied to the searched location.

> **B.** **The Affidavit Demonstrates that Johnson Was Actively Involved In Trafficking Drugs While Armed With a Gun**

Agent Sparks was a member of a team that executed a search warrant at X Street, S.E., Washington D.C.  Agent Sparks participated in the arrest of Johnson after the FBI recovered PCP, crack cocaine, marijuana, a .380 caliber pistol, .45 caliber ammunition, and body armor at the residence.  A Federal Grand Jury returned a three-count indictment charging Johnson with Unlawful Possession With Intent to Distribute 100 Grams or More of Phencyclidine, Using, Carrying, and

Possessing a Firearm During a Drug Trafficking Offense, and Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year.  Moreover, Agent Sparks learned that in August 2006, an assault rifle and .45 caliber ammunition had been recovered from Johnson's home.

### C.   Defendant Johnson's History Indicates That He Has an Affinity for Guns and Ammunition

Agent Sparks learned that members of the Metropolitan Police Department (MPD) executed a search warrant at X Street, S.E., Washington D.C. on August 24, 2006.  At that time, law enforcement recovered an SKS assault rifle, a box of .45 caliber ammunition and mail matter bearing the name Timothy P. Johnson.  Moreover, when Johnson was arrested by Agent Sparks on November 27, 2007, he possessed a D.C. driver's license which listed X Street, N.W., as his home address.  Therefore, when SA Sparks applied for a search warrant in February 2008, he had an 18-month history involving the defendant and illegal firearms to fall back on.

### D.   The Affidavit Demonstrates that Johnson Was Connected to the Targeted Address of 4645 A Street, S.E.

Here, the affiant, a seasoned FBI agent, came into possession of several photographs which he had enlarged and sent to an MPD firearms examiner.  The examiner conducted an exhaustive review of the photos and determined that one or more of the firearms appeared real.  Agent Sparks noticed specifically the presence of the grayish sofa sitting against a blue wall.  When the MPD detectives visited the residence at X Street, they observed what they believed to be the same sofa sitting against the same blue wall.  Additionally, Johnson was inside the residence on August 7, 2007, and the owner/occupant at X Street confirmed that she was Johnson's aunt.  Defense counsel's argument that no information links the Lindsey residence to criminal activity is without merit, in light of the overwhelming evidence of Johnson's involvement in narcotics trafficking while

armed, the photographs depicting Johnson and his son with firearms, and Johnson's presence inside the residence.

**II.     The Information Contained in the Affidavit Was Timely in Light of the Nature of the Charges Being Investigated and the Circumstances of Parallel Investigations.**

As part of his review, the magistrate must evaluate the timeliness of the information offered in the affidavit considering the unique circumstances of the case. Sgro v. United States, 287 U.S. 206, 210-11, 53 S.Ct. 138, 77 L.Ed. 260 (1932). However, "'[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'" United States v. Rhynes, 196 F.3d 207, 234 (4th Cir.1999) (quoting United States v. McCall, 740 F.2d 1331, 1336 (4th Cir.1984)).

In the present case, the evidence relied upon in the warrant affidavit was timely based upon the unique circumstances of the case. The FBI's investigation of Johnson culminated in his arrest and the search of his residence in Washington D.C. on November 27, 2007. During the 72-day period following these events, law enforcement personnel from the FBI and MPD discovered their parallel investigations of Johnson and shared their respective sources of information. The FBI subsequently combined the evidence it had amassed against Johnson with the information derived from the MPD investigations. SA Sparks determined that the aggregate evidence established probable cause to search the Lindsey home at X Street, S.E., Washington, D.C. for additional evidence relating to Johnson's illegal activities. Consequently, SA Sparks submitted the warrant application relying on the totality of evidence developed by both agencies. The discovery of parallel investigations and the complexity of multi-agency coordination were unique circumstances that must be considered under Sgro in determining whether the information in SA Sparks's affidavit was stale.

The potential for judicial concern about the staleness of the evidence supporting the search warrant is further minimized by the nature of the crimes being investigated. Evidence of extended conspiracies or ongoing crimes receives more leniency in determining its timeliness for the purpose of establishing probable cause. United States v. Farmer, 370 F.3d 435, 438-39 (4th Cir. 2004); United States v. Webb, 255 F.3d 890, 904-05 (D.C. Cir. 2001). Gun possession and drug trafficking are ongoing crimes accompanied by physical evidence that is reasonably expected to be maintained for a considerable time. United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995) (finding the age of supporting evidence for gun possession violations "less significant" in light of the ongoing nature of the crime); United States v. Edelin, 128 F. Supp.2d 23, 46 (D.D.C. 2001) (noting that evidence of conspiracy to distribute drugs would be maintained long after the criminal activity had ceased). The quantities of illegal firearms and narcotics recovered during the August 2006 and November 2007 searches demonstrate the reasonable belief of law enforcement officials that Johnson was extensively involved in both types of activity. In light of the nature of these crimes, the age of the supporting evidence in the warrant affidavit is of diminished importance in the probable cause analysis.

The length of the investigation also reflects the efforts made by the FBI and MPD to pursue other investigative avenues before seeking to search the Lindsey home. The photographic evidence of Johnson and his infant son demonstrate his possession of a Glock pistol and a Tec-9 type assault pistol. MPD investigators were further able to establish the likelihood that the photographs depict Johnson's possession of these weapons in the Lindsey home. Despite this evidence, law enforcement officials chose initially to focus their efforts on two other dwellings where Johnson resided and may have placed the firearms, in an attempt to avoid unnecessarily disrupting the

Lindsey home.[4]  Only after these independent searches and the recent arrest of Johnson failed to locate the evidence was a search warrant sought for the Lindsey home.  Determining that the thorough and deliberate nature of the law enforcement officials' actions in this case rendered the supporting evidence stale would undermine the judicial preference for search warrants expressed in Ventresca and incentivize haste over certainty in future search warrant applications.  See Ventresca, 380 U.S. at 109.

More specifically, one aim of law enforcement was to photograph the greyish sofa and blue wall in the Lindsey home, regardless of the discovery of any additional weapons.  Though six months had passed since MPD had been inside the residence, it is not uncommon for walls to remain the same color for years.  It is likely, too, that the greyish sofa would remain in the same condition and position where it was first observed.

### III.   In Any Event, Suppression Is Not The Remedy, Because Under Leon, Police Had A Good Faith Basis To Execute The Search Warrant

Even if this Court were to find the warrant lacked probable cause or was stale, suppression by the trial court would not be the appropriate remedy as the officers conducting the search acted in "objectively reasonable reliance" on the warrant's validity.  United States v. Leon, 468 U.S. 897, 922 (1984).  Ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search.  Id.  Suppression in such a case is appropriate only if "the magistrate abandoned his detached and neutral role" in assessing the affidavit, or if "the officers

---

[4] The FBI searched X Street, S.E., #101, Washington D.C. in November 2007 and the MPD searched X Street, S.E., Washington, D.C. in August 2006.  Both searches resulted in the seizure of illegal firearms and ammunition, but failed to locate the weapons seen in the photographs.

were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." Id. at 926.

There is no evidence here that the affidavit on its face was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. As discussed above, Magistrate Judge Kay determined that the affidavit presented a substantial basis for probable cause. Absent some information that Agent Sparks knew that what he was stating in the affidavit was wrong – which is simply not supported by the evidence – there is no basis under Gates or Leon to overturn the warrant decision.

**IV.     Police Officers Properly Secured The Defendant Inside the Residence and the Statement was Not Made in Violation of Miranda v. Arizona**

**A.     The Officers Properly Detained The Defendant During The Execution Of The Search Warrant.**

The police officers could properly detain the defendant while they executed the search warrant, because he was an occupant of the residence upon their arrival. In Michigan v. Summers, 452 U.S. 692, 705 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." In Summers, police stopped the defendant as he was "descending the front steps" and not inside of the premises. Id. at 693. The Supreme Court noted that the detention of the defendant was justified to prevent flight of the individual, to minimize the risk of harm to the officers, and to effectuate an orderly completion of the search. Id. at 702-03.

In the instant case, the officers properly detained the defendant, primarily because he was inside the residence, to prevent his flight, minimize the risk of harm to the officers, and to effectuate an orderly completion of the search. As detailed above, the search warrant was based on probable

cause that another individual was actively engaging in the dangerous activity of selling narcotics while armed with a firearm. Moreover, the officers believed that the residence with the grey sofa and blue wall was home to several firearms, and, as a result, the likelihood that weapons were present placed the officers on high alert.

Accordingly, as the Supreme Court in Summers recognized, it was proper to place the defendant on the couch in handcuffs. See also United States v. Cochran, 939 F.2d 337, 338 (6th Cir. 1991) (finding no Fourth Amendment violation where the police went to the defendant's house to execute a search warrant, observed him leaving the premises by car, and the car traveled a short distance before it was stopped by the police and the defendant was detained for the search); United States v. Yates, 132 F.Supp.2d 559 (E.D.Mich.2001) (holding the stop of a defendant two miles from his home, when he was traveling away from his residence, did not violate the defendant's Fourth Amendment rights).

### B. The Officers Were Justified in Placing The Defendant On The Couch Consistent With The Bounds of an Investigatory Stop.

To the extent the stop of the defendant is construed as investigatory in nature, the officers could still properly limit him to the couch to achieve the legitimate goals of safety and security while they searched for items associated with armed drug dealing activity. See United States v. Nurse, 916 F.2d 20, 24-25 (D.C. Cir. 1990) (holding that officers' conduct in preventing defendant from getting into a taxi and escorting her back into the train terminal did not "exceed[ ] the established bounds for reasonable suspicion detentions") (citation omitted); see also United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005) (recognizing that "we have held that the police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of

11

achieving the legitimate goals of the detention 'given the specific circumstances' of the case"); United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) (recognizing that "it is well established that officers may ask (or force) a suspect to move as part of a lawful Terry stop").

### C. Defendant's Statements Were Not In Violation of Miranda, and Were Voluntarily Made.

The scriptures of Miranda are implicated only when two circumstances are both present: the defendant is in custody, and he is being interrogated. Miranda v. United States, 384 U.S. 436 (1966). Miranda's requirements are inapplicable if a suspect is questioned by the police but not in "custody" at the time. See Beckwith v. United States, 425 U.S. 341 (1976).

As legions of cases have made clear, the type of "custody" that requires police officers to provide a defendant with Miranda warnings involves circumstances where a defendant is "subjected to restraints comparable to those associated with a formal arrest." Berkemer v. McCarty, 468 U.S. 420, 441 (1984). This is an objective test, not subject to the idiosyncracies of a particular defendant's point of view; "the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation." Id. at 442. Determining whether certain circumstances amount to a "formal arrest" for Miranda purposes requires a focus on whether those circumstances are equivalent to what the Miranda warnings are designed to protect: situations equivalent to the police stationhouse interrogation. See id. at 437-8 ("Fidelity to the [Miranda doctrine] . . . requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the [Miranda] decision are implicated. . . . questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation").

Amounting as it does to a "formal arrest," "custody" for purposes of Fifth Amendment Miranda analysis is clearly something more than what constitutes a "seizure" under the Fourth Amendment; "custody" and "seizure" are not synonymous. United States v. Gale, 952 F.2d 1412, 1415-16 n.4 (D.C. Cir. 1992) ("Although appellant was not free to leave at the time Officer Stroud asked him if he had any drugs, he was subject to a limited seizure only – a Terry stop – and not a 'full-blown' arrest. As such, the stop did not require the police to inform appellant of his Miranda rights before asking him a few brief questions designed to confirm or alleviate their suspicions . . . . There was thus no Miranda violation in asking appellant whether he had any illegal drugs . . . ."). Therefore, short of circumstances equivalent to a formal arrest, even when a defendant is subject to police restraint that rises to the level of a Terry stop, the Miranda warnings are not required.

The fact that probable cause existed for an arrest from the moment the officers located contraband in a second-floor bedroom does not impact the analysis of whether, for Fifth Amendment purposes, defendant was in custody and therefore subject to Miranda's warnings. "The mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings . . . ." Minnesota v. Murphy, 466 U.S. 420, 431 (1984). "Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry." Stanbury v. California, 511 U.S. 318, 324 (1994).

Indeed, "the existence of probable cause does not by itself compel officers to forego an investigatory stop and make an arrest." United States v. Waltzer, 682 F.2d 379, 373 (2d Cir. 1982). "Law enforcement officers are under no constitutional duty to halt a criminal investigation the

13

moment they have the minimum evidence to establish probable cause. . . ." Hoffa v. United States, 385 U.S. 293, 310 (1966). In Berkemer the state trooper "apparently decided as soon as [defendant] stepped out of his car that [he] would be taken into custody and charged with a traffic offense." 486 U.S. at 442. However, the officer did not communicate his intention to defendant. Id. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Id.

It is clear in the instant case, as noted above, that the defendant was not in "custody" for Fifth Amendment purposes when Agent Sparks asked him if the room with the bunkbeds was his. Although probable cause to arrest him arose either shortly before or shortly after the question was posed, the defendant was not placed under formal arrest until after the firearms and mail matter were discovered. Thus the question put to him, whether the bedroom was his, was merely part of the investigatory component of the execution of the search warrant. At the time of the single-question inquiry, the defendant had been held on the couch only briefly.

The government must also establish by preponderance of the evidence that the defendant's statement was voluntarily made. See Lego v. Twomey, 404 U.S. 477, 489 (1972). To determine whether a statement was voluntarily made, this Court must examine the totality of the circumstances to determine whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." See Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); Colorado v. Connelly, 479 U.S. 157, 167 (1986). In making this determination,

> a district court must examine 'the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation.' Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed.2d 854 (1973). Relevant factors include: the youth of the accused; his lack of education; or his low

intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

United States v. Rodney, 956 F.2d 295, 297 (D.C. Cir. 1992).

The government expects that, if a hearing is held on this matter, the totality of circumstances would demonstrate that defendant's statement was voluntarily made, and that his will was not overborne. The defendant identifies no coercive police activity, and the circumstances of defendant's statement, in particular, the brevity of the question and answer, do not suggest that it was the product of coercive police activity, or was in any other way involuntary.

WHEREFORE, the government respectfully requests that the Court deny defendant's initial motion and supplemental motion to suppress tangible evidence and statements.

                    Respectfully submitted,

                    JEFFREY A. TAYLOR
                    UNITED STATES ATTORNEY

                    /s/
By:  ERIC P. GALLUN
      Assistant United States Attorney
      Bar No. 462025
      Organized Crime and Narcotics
      Trafficking Section
      555 4th Street, N.W.
      Washington, D.C. 20530
      (202) 514-6997
      Frederic.Gallun@usdoj.gov